[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The two cases encaptioned above were consolidated for trial and arise out of the same set of circumstances. The Food Studio, Inc., is a Connecticut corporation whose president is Cynthia Kruth. In 1993, an entity called Foursquare Associates leased to Food Studio a portion of the premises located at 195 West Main Street in Avon for use as a gourmet catering and delicatessen shop, cooking school and/or retail food store. Food Studio, after occupying the premises for a time itself and after subleasing the premises to New York Deli briefly, entered into a subleasing arrangement with Fabiola's, a partnership whose partners were Fabiola Bowles and Francesco Bowles, sister and brother. The sublease was executed on November 1, 1995. On the same day, the parties executed a separate lease for various items of restaurant equipment. The sublease, as modified, required a security deposit of $1,450 and monthly rental payments of $1,450, as well as "the cost of electricity and a pro rated share of sewer assessment and real estate taxes." The equipment lease called for a security deposit of $400[1] and monthly payments of $200; the lease also provided for an option to buy many of the items. Although the Bowles's testified that they intended to reopen the restaurant virtually immediately and thought that the premises would be in a "turnkey" condition, the sublease and the equipment lease both specifically referred to the opening of business on December 1, 1995. Both leases terminated on December 31, 1996, which was the same date that the underlying lease between Foursquare and Food Studio terminated.
Fabiola's did open for business on approximately November 20, 1995. Apparently a problem with one of the sinks had caused a slight delay in obtaining Health Department approval, but the restaurant nonetheless opened to the public before the time stated in the leasing documents. Almost immediately areas of friction arose between the parties. Fabiola's identified problems with several items of the equipment which had been leased, including leaks in sinks, defects including loose seals and CT Page 7617 difficulty with a drain in refrigerators, and a convection oven which did not cook evenly. Fabiola's apparently had no need for a number of the items included in the equipment lease, apparently including a table, a cash register, a safe and some shelving, and Ms. Kruth or her husband removed those items in November or December of 1995 and sold them for several hundred dollars.
In the first few months of the lease, Fabiola's was consistently late in its rental payments by a matter of several days. The sublease and the equipment lease called for the monthly rental payments to be made "in advance"; the evidence showed that the payment for December, 1995, was received on December 7; the January, 1996, payment on January 4; and the February payment was received on February 20.[2] Although the first several rental payments were paid in person when Kruth came to the premises, payments beginning with the February payment were mailed, as Francesco and Fabiola Bowles claimed that Ms. Kruth and her husband created a disturbance when they came to the premises on approximately February 2 to collect rent. Fabiola's wrote a letter dated February 2, 1996, in which they said that future communications should be in writing; the letter also expressed concern about allegedly defective equipment included in the lease. At this time payment had apparently not been made for real estate taxes, but there had been concerns about whether the amounts had been properly calculated. By May or June, 1996, the subtenants were current on real estate taxes, and no further question seems to have arisen regarding taxes.
The March, 1996, payment was received on March 14, 1996. By that time, however, Food Studio had served Fabiola's with one of the instant actions, No. CVH 5511.[3] The original complaint alleged that timely payments had not been made pursuant to the two leases and further claimed that some of the leased equipment had been damaged and some removed without permission. The action also claimed that attorney's fees were due.[4]
The service of the complaint did not still the troubled waters; indeed, communication which presumably should be fairly simply and straightforward was, from that point on, conducted through attorneys.[5] The dispute as to taxes was discussed in correspondence in April, 1996. Fabiola's had moved some equipment from the premises early in 1996 to be repaired; by letter dated April 18, 1996, Henry Ide, the attorney for Fabiola's, asked Martin Goldberg, the attorney for Food Studio, for consent to remove and store a convection oven which Fabiola's was not using, CT Page 7618 in order to create room for more utilitarian equipment. That consent was denied by letter dated April 22, 1996: Mr. Goldberg conditioned consent on immediate payment of real estate taxes, a portion of which had only been specifically calculated and communicated in the same letter denying consent, and, among other things, paying Mr. Goldberg's legal bills within 30 days of billing.[6] Apparently finding this denial of consent unreasonable, Fabiola's removed the oven, stored it in several places over the next year, and ultimately it was returned to Food Studio along with almost all the rest of the equipment.[7]
In the meantime, rental and equipment lease payments were made regularly, though usually somewhat late, and at least the stove, and perhaps some other items, were stored off premises. After several months of storage in his garage, or that of his parents, Francesco Bowles arranged for storage in another portion of 195 West Main Street. Food Studio apparently did not know the whereabouts of the equipment, although it is not entirely clear that it specifically asked.
At the time of the expiration of the agreements, another flurry of correspondence occurred. After December 31, 1996, Food Studio no longer had a property interest in the premises, and, while negotiations between Fabiola's and Foursquare were proceeding, Fabiola's remained in the premises on a month to month basis. In July, 1997, Fabiola's and Foursquare entered into a formal leasing arrangement, and apparently Fabiola's is still doing business on the premises. Fabiola's did not pay the last month's rent, as it apparently assumed that the security deposit would be used for that purpose.
In December, 1996, Ide, the attorney for Fabiola's, wrote to Goldberg and suggested that the parties reach an agreement as to the equipment. There had been an option to purchase many of the items, and Ide suggested that Fabiola's was interested in purchasing much of the equipment. He said that he would be away from December 20 through January 3, 1997, and suggested that the parties try to work out an arrangement on his return. On December 31 Ide wrote and faxed another letter to Goldberg (apparently signed by Ide's secretary) suggesting that they discuss the equipment on his return.
Rather than discuss the return, Cynthia Kruth appeared on the premises on January 3, 1997, and demanded the immediate return of all the equipment. There was testimony by a waitress that she CT Page 7619 heard Kruth accuse Ms. Bowles of stealing the equipment; in any event, there was a brief discussion in the back room and Ms. Kruth left to go to the local constabulary. According to a police memorandum, Kruth wanted either the equipment returned or Ms. Bowles arrested for theft. The police referred the matter for advice to the state's attorney, who determined that the matter was civil and not appropriate for criminal action.
In the first half of 1997, a stand-off developed as to the equipment. Not surprisingly, the parties were unable to agree on terms of purchase. They could not even agree on the method of return of the equipment: Fabiola's indicated that Kruth could pick up the equipment at specified times at the premises, while Kruth wanted the equipment delivered to her. Ultimately, on July 15, 1997, Kruth did pick up the equipment and ultimately sold it to a wholesaler for about $2600.[8] Food Studio is pressing a claim for an alleged diminution in value of the equipment; the only evidence supporting such a claim seems to be the difference between the amount received for the property and the amounts which were listed as potential sales prices in the equipment lease with Fabiola's.
As noted above, Food Studio brought suit against Fabiola's in March, 1996, while the events were still brewing. The first count of the currently operative complaint alleges that Fabiola's failed to pay its rent in a timely manner and seeks such amounts, plus attorney's fees. The second count concerns the equipment lease and alleges that timely payments were not made and, additionally, alleges that Fabiola's failed properly to maintain the equipment and that Fabiola's removed some of the equipment without consent. This count again seeks attorney's fees. The third count alleges conversion of the equipment, specifically the convection oven(s). The fourth count alleged theft and seeks treble damages pursuant to § 52-564 of the General Statutes. There were a number of special defenses asserted: these include an allegation that payments were made, that some equipment was not in working order and that the plaintiff in this action had been advised as to the whereabouts of the equipment.
Fabiola's has also brought an action against Food Studio. The action was served in February, 1997. The operative pleadings include, in the first count, a claim that Food Studio breached the leasing agreement in that the premises were not ready for occupancy on November 1, 1995. The second count alleges that some of the leased equipment was defective and that expenses for CT Page 7620 storage and replacement were therefore incurred. The third count alleged that because Food Studio failed to pick up equipment on expiration of the equipment lease, it incurred storage expenses. The fourth count, which includes Fabiola Bowles individually as a plaintiff and Cynthia Kruth individually as a defendant, alleges slander as a result of the January 3 episode. A defense to the slander count alleges that the conversation which Ms. Kruth had with the police was an occasion of privilege and thus not actionable.
 I
The first matter considered is Food Studio's claim for payments under the lease. In this context, it should be borne in mind that:
 A lease is a contract. In its construction, three elementary principles must be kept constantly in mind: (1) the intention of the parties is controlling and must be gathered from the language of the lease in light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible. Hatcho v. DellaPietra, 195 Conn. 18, 20 (1985).
The lease in this matter, as noted above, calls for monthly rental payments to be made in advance. There is no provision in the lease between Fabiola's and Food Studio for any payment of late fees, and, indeed, there is no stated remedy for noncompliance with the terms of the lease. The lease does state that it is "subject to the terms of the lease of the premises . . .", referring to the underlying lease between Food Studio and Foursquare. It is not clear which, if any, of the terms of the underlying lease were intended to be incorporated into the lease with Fabiola's. There is a provision in the underlying lease, Article 3, that a late fee of 5% may be assessed if payment is more than ten days late twice in a calendar year, and Article 29, § 1 provides for default and termination if nonpayment continues ten days after written notice. It is not disputed, in any event, that the entire amount of rent due under the lease has in fact been paid.[9] There does not appear to have been a specific demand for late payments; for CT Page 7621 example, the accounting for the security deposit, Plaintiff's Exhibit 6, does not include a claim for late payments. In light of the omission of any reference to late charges in the lease between the parties and of the subsequent conduct, the court finds that no specific late charge was intended in the agreement between the parties. As a consequence, then, there are no payments for rent due.
Food Studio claims, however, that it is entitled to legal fees regardless of whether any amounts are otherwise due and owing under the first count. It points to § 6 of the lease, which provides that "[e]ither party needing to take legal action to enforce this agreement will be entitled to reasonable legal fees from the other party." Food Studio claims, essentially, that Fabiola's was behind in its obligations when suit was brought and, were it not for the legal action brought, there was no guaranty that Fabiola's would have remained more or less current. Food Studio has presented a legal bill in excess of $17,000 for time prior to trial which it claims ought to be paid by Fabiola's.
It is of course true that where a contract calls for attorney's fees, they may be awarded by the court, but the award is subject to judicial discretion. "Where a contract expressly provides for the recovery of attorney's fees, an award under such a clause requires an evidentiary showing of reasonableness"; RizzoPool Company v. Grosso, 240 Conn. 58, 77 (1997); and a court may rely on its own knowledge of the circumstances in the exercise of discretion. Bizzoco v. Chinitz, 193 Conn. 304, 310-11 (1984). In the context of attorney's fees under CUTPA, the Appellate Court adopted twelve criteria to be considered: the time and labor required; the novelty and difficulty of the matter; the skill required; whether other work was precluded by working on the case in question; the customary legal fee in the community; whether the fee was fixed and contingent; any time limitations; the amount at stake and the results obtained; the experience, reputation and ability of the attorney; the "undesirability" of taking the case; the nature and length of the professional relationship with the client; and awards of attorney fees in similar cases. Steiger v. J.S. Builders, Inc., 39 Conn. App. 32,38 (1995). See also Johnson v. Georgia Highway Express, Inc.,488 F.2d 714, 717-19 (5th Cir. 1974). Although attorney's fees based on contractual provisions may well be governed by different considerations than attorney's fees under civil rights cases such as Johnson and CUTPA claims such as Steiger, some of the criteria CT Page 7622 are useful.
More directly on point is Buccino v. Cable Technology, Inc.,25 Conn. App. 676 (1991). There, a contractual clause provided for attorney's fees if resort to an attorney was necessary to enforce the terms of the lease. In Buccino, the defendants apparently didn't dispute their obligations, and the court found that litigation, though in a sense successful, had not been necessary to enforce the lease. The trial court, therefore, declined to award attorney's fees, and the holding was upheld on appeal.
The language regarding attorney's fees in the instant case is similar to that of Buccino: attorney's fees are allowed in necessary to enforce the terms of the lease. I do not find in this case that the litigation was necessary: the pattern of the payment of rent was not significantly different after the institution of the action than it was before: the sublessee always paid, though frequently late. The taxes were paid when computed. Not only did the defendant agree to the obligation, as in Buccino, it was actually paying the obligation. So far as the court can tell, the institution of litigation only served the purpose of imposing another level of expense and inconvenience for all parties. Indeed, the litigation may have contributed to the delay in paying rent, as at least some of the rental payments were physically sent from Fabiola's to their attorney to the other party.
Other factors give one pause as well, when one is to consider whether resort to litigation was necessary. The attorney was, as noted above, the husband of the president of Food Studio and was an officer in the corporation. Although real bills apparently were presented to the corporation, none were paid and there was no evidence that they were intended to be paid unless they should be recovered from Fabiola's. The hourly rates stated in the bills are $200 per hour and, later, $250 per hour. These are premier rates, and the attorney is not experienced in litigation. Had the attorney-client relationship been an ordinary business transaction, the court doubts whether litigation would have been undertaken. Further, although the criteria listed in Steiger are not directly transferrable to the dispute at hand, I find that none of the factors tend to compel generous compensation.
A final consideration is merely practical. If attorney's fees were allowed in this case, a tenant would, in effect, pay a late CT Page 7623 penalty many times the amount of the rent which was late. If there is to be a late fee, it ought to be simply stated as such.
Judgment may enter for the defendant on the first count.
 II
The second count similarly cannot avail the Food Studio to a significant extent. The claim as to payment of the rental amounts due on the equipment lease is identical to the claim for rent under the sublease, and no further discussion would be useful. As to the alleged failure to maintain the equipment, Food Studio failed to sustain its burden of proof as to any specific damage. As noted above, Food Studio deliberately sold the equipment while a request to inspect the property was pending; it may not prevail, then, on any claim regarding condition of the property. I do find, however, that a telephone, waste basket and toaster were not returned, and award Food Studio $20 in damages. Again, I do not find that litigation was necessary to compel compliance with any of the terms of the lease, and the amount actually recovered is too trivial to justify attorney's fees, under all the circumstances of this case.
The third and fourth counts, conversion and theft, need not be considered in any detail. Suffice it to say that conversion is proved only as to the three items listed above, and theft, requiring an intent to deprive the true owner, has not been proved.
 III
We turn now to the allegations of Fabiola's cause of action. The first count alleged that Food Studio breached the contract by failing to provide premises that were in a "turnkey" status. Using the principles of contract construction referred to above, I find that the terms of the lease clearly contemplate opening to the public by December 1, 1995. As the terms of the lease are clear[10] and as Fabiola's indeed did receive all necessary approvals to open to the public, there are no damages that can be awarded pursuant to the first count.
The second count alleges damages for defective equipment under the lease. The flaw in the theory is that the lease, and the supporting schedules, clearly state that the equipment is leased "as is", and there is a recital that Francesco Bowles had CT Page 7624 had an opportunity to inspect the equipment. Although Francesco testified that his understanding was, roughly, that "as is" meant operable, I find that "as is" has a clear and generally understood meaning: no representations at all are made regarding the condition of the articles, and the buyer, or in this case lessee, takes at his peril. Judgment may enter for Food Studio as to this count.
The third count alleges breach of contract, in that Fabiola's had to store the equipment beyond the termination date of the lease. Although the question is a very close one, I find that because further negotiations were suggested by Fabiola's, and because the equipment lease is silent as to what was supposed to happen at the end of the lease — presumably, in the circumstances, some of the equipment could have been used by Fabiola's until the situation was resolved — Fabiola's has not sustained its burden of proof.
Finally, I find that there can be no recovery on the claim of slander. First, the complaint alleged only that Ms. Kruth made a complaint to the Avon Police Department which was allegedly slanderous. The testimony of Ms. Farrell to the effect that she heard Ms. Kruth say something to the same effect is not relevant to the allegations of the complaint, and it is a significant enough departure from the pleadings to suggest that Ms. Kruth would be prejudiced were the court to find Ms. Kruth liable as a result of that statement. Additionally, though given an opportunity, Fabiola's never sought to amend the complaint. I do not consider, then, the testimony of Ms. Farrell.
Even if Ms. Kruth claimed to the Avon Police Department that Ms. Bowles was a thief, it is quite clear that statements made to police in their capacity as officers are entitled to a limited privilege. See, e.g., Flanagan v. McLane, 87 Conn. 220 (1913). The entire police report, which was admitted as an exhibit, shows that the underlying facts related to the police were not entirely untrue; indeed, Ms. Kruth apparently reported that the items had been leased to Fabiola's and that the lease had expired; she also reported that a civil action was pending. Although a complaint to police may well have been an overreaction, the circumstances indicate that Ms. Kruth is entitled to the qualified privilege.
 IV
I conclude, then, that judgment may enter for the defendants CT Page 7625 in No. 5511, except that judgment may enter for the plaintiff in the amount of $20 as to the second count. In No. 5892, judgment may enter for the defendants.
Beach, J.